IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02568-MEH

TONYA MEIMAN and
PAUL MEIMAN,

      Plaintiffs,

v.

AMERICAN FAMILY MUTUAL INS. CO.,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**

      Before the Court is Defendant's Motion for Partial Summary Judgment (ECF 30) which is fully briefed for judicial review. Also before the Court is Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF 40) to which Defendant has responded (ECF 49). Based on the analysis herein, the Court rules on it without awaiting a reply. *See* D.C.COLO.LCivR 7.1(d). The Court also finds that oral argument will not materially assist in either Motion's adjudication. For the following reasons and based on the submitted record, the Defendant's Motion is denied, and Plaintiffs' Motion is denied as untimely.

## <u>BACKGROUND</u>

**I.    Claims for Relief**

      Plaintiffs seek to recover the full benefit of their combined UIM policies to compensate Tonya Meiman for the damages she attributes to a motor vehicle accident. Defendant seeks summary judgment in its favor on their statutory and common law claims that it handled the policy

claim unreasonably and/or in bad faith. Defendant does not seek summary judgment on Plaintiffs' remaining breach of contract claim.

Tonya Meiman is the principal claimant against the UIM insurance policy contract. The claims at issue in this lawsuit concern the motor vehicle accident in which she was involved and the medical care that she received. By contrast, Paul Meiman's claims for relief are more derivative or indirect in nature. For those reasons, the Court will distinguish between Mrs. Meiman's claims and allegations and "Plaintiffs" (when referring to their case as a whole).

## II.     Statement of Undisputed Material Facts ("SUMF")

1.     Mrs. Meiman was involved in a motor vehicle accident on May 4, 2015. ECF 5 at ¶¶ 6-7, 12; ECF 30-5 at 49; ECF 40-1 at 56.

2.     The tortfeasor, who was driving a 2006 Saturn Vue, rear-ended Mrs. Meiman in her 2005 Pontiac minivan. *Id*.

3.     Mrs. Meiman declined to go to the hospital. She preferred to leave with her husband and return home. However, for about half an hour, she did speak with EMTs at the scene. ECF 30-1 at 8-9. She told them that she was nauseous; her knees, low back, neck, and head hurt; and she felt very shaken up emotionally. ECF 40-1 at 54. Of those complaints, neck pain was the worst. ECF 30-1 at 9.

4.     The medical conditions that Mrs. Meiman attributes to the car accident include: a concussion, post-concussion syndrome, cervicalgia, muscle spasm, thoracic spine pain, neck pain, hip pain, shoulder pain, vision problems, dizziness, difficulty concentration, and fatigue. She also relates the neck surgery that she underwent later in February 2019 to the motor vehicle accident.

5.     The first form of medical treatment that Mrs. Meiman sought was chiropractic care. ECF 30-1 at 9.

2

6.      Less than five months after the accident, on September 21, 2015, Mrs. Meiman reported to her chiropractor a ninety percent overall improvement, including an eighty-five percent improvement of neck and upper back pain. ECF 30-2 at 1. Citing the report of Dr. Larson at ECF 40-19, Mrs. Meiman explains that her symptoms had waxed and waned over the full course of her ninety-three chiropractic visits, and they did not fully resolve in 2015 or 2016.

7.      On April 10, 2017, the chiropractor declared Mrs. Meiman to be at maximum medical improvement. That treatment note describes decreased symptoms and gave a positive assessment. ECF 30-2 at 2.

8.      During the time frame of June 16, 2017 to March 20, 2018, Mrs. Meiman had only four medical appointments (two of which were for massages). ECF 30-1 at 10.

9.      Thereafter, she had no medical appointments at all until January 8, 2019. *Id.*

10.      On the morning of January 8, 2019, Mrs. Meiman experienced a sharp increase in neck pain while waking up and stretching in bed. ECF 30-1 at 11.

11.      An MRI was taken of Mrs. Meiman's cervical spine on January 31, 2019. It showed an extrusion at the C6-C7 disc site that was compressing the left C7 nerve root; mild cord impingement and mild stenosis at C5-C6; a protrusion at C4-C5 without cord compression; and mild bulging at C3-C4. ECF 30-2 at 5-6.

12.      Mrs. Meiman underwent C6-C7 disc replacement surgery on February 21, 2019 following January's increase in neck and arm pain. ECF 30-2 at 7.

13.      At a follow-up appointment on March 6, 2019, Mrs. Meiman asked her treating orthopedic surgeon, Dr. Benz, whether the condition subject of the surgery "was due to her motor vehicle accident that occurred in 2015." Dr. Benz was hesitant to relate Mrs. Meiman's 2019 pain to the 2015 car crash, explaining that "it is very difficult to say with any type of certainty whether

3

or not [it had] caused the current herniation." While she "was having some on and off symptoms" previously, it was not until January 2019 when she "develop[ed] significant arm symptoms." Dr. Benz "would have a hard time" asserting a causal relationship, but "there is no way to know with absolute certainty," he reiterated. ECF 30-2. Mrs. Meiman points out that Dr. Reinhard did see a causal relationship between the two, and after reviewing his report (ECF 40-27), Dr. Benz agreed (ECF 40-26).

14.     Tonya and Paul Meiman are the named insureds on Family Car Policies that Defendant had sold them. They were in effect on May 4, 2015 (the day of the motor vehicle accident). ECF 30-3.

15.     Those policies provided a total UIM benefit of $300,000.00. ECF 19 at 5.

16.     The policies contained a provision that obligated Plaintiffs to "cooperate with [Defendant] and assist [Defendant] in any matter concerning a claim or suit." ECF 30-3.

17.     Mr. and Mrs. Meiman sued the tortfeasor who had caused the motor vehicle accident. ECF 19 at 2.

18.     Defendant permitted them to settle that lawsuit and accept the full $100,000 limit of the tortfeasor's insurance policy. The settlement occurred on August 20, 2019. *Id*. at 5.

19.     On April 15, 2019—nearly four years after the accident but four months before settling with the tortfeasor—Mrs. Meiman gave Defendant her First Notice of Loss against her own policy. ECF 30-4.

20.     On April 16, 2019, Defendant's UIM adjustor requested from Plaintiffs' counsel disclosure authorizations and a claimant fact sheet. ECF 30-5.

21.     Plaintiffs' attorney answered the request on April 30, 2019 by providing signed authorizations for health and employment records and a list of Mrs. Meiman's medical care

providers. Her attorney also submitted her medical and billing records which totaled $51,938.43 at that time. *Id*.

22.     Defendant requested an update on the status of the underlying personal injury lawsuit on May 16, June 26, and August 7 of 2019. *Id*.

23.     It was not until September 9, 2019—although less than a month after the settlement—when Plaintiffs' counsel gave Defendant a copy of the agreement and dismissal order. *Id*.

24.     On October 11, 2019, Defendant asked Plaintiffs' attorney for any additional bills, records, and wage loss information. *Id*.

25.     Also on October 11, 2019, the adjustor updated the claim file by noting a total of $51,677.60 in medical bills received. Defendant had no *Fisher* payment due at that time. Plaintiffs' attorney had informed the adjustor to expect a demand package. *Id*.

26.     On November 20, 2019 and again on January 7 and January 30 of 2020, Defendant requested the status of the claim and any additional medical bills, records, and wage loss information. *Id*.

27.     The adjustor noted that Defendant had received no further response from Mrs. Meiman about whether she intended to pursue a UIM claim for the reported $51,577.60 loss. Finding "no indication of UIM exposure based on info received to date," the adjuster 'inactivated' the claim on March 4, 2020. However, the adjustor would reopen it "if/when additional information is received to indicate a UIM exposure as such." *Id*. at 27.

28.     On June 2, 2020, Mrs. Meiman's attorney submitted an index listing all medical records provided and bills totaling $57,576.04 in medical expenses for Defendant to conduct its "preliminary evaluation." The attorney asserted that Mrs. Meiman had suffered injuries that

5

necessitated substantial treatment, treatment which improved her condition significantly. *Id*. at 31-32.

29.     On June 30, 2020, Defendant asked for confirmation that it had all medical bills for the $57,576.04 that Mrs. Meiman was claiming. That total included $23,114.00 for the C6-C7 disc surgery in February 2019. Because the reported cost of that procedure seemed unusually *low*, the adjustor "wanted to be certain that we were not missing anything in our review." ECF 30-5 at 33. The adjustor also requested more authorizations for the disclosure of medical information and asked whether Mrs. Meiman was claiming lost wages. *Id*.

30.     The adjustor had not used the disclosure authorizations that Mrs. Meiman had submitted previously in May 2019. At his deposition, the adjustor explained that at that time, he saw no need to use them because he believed Defendant already had received all records. ECF 40-2 at 15. The adjustor regarded Mrs. Meiman's records submission at that time as sufficient, although it did not include ongoing treatment. *Id*. at 16.

31.     Mrs. Meiman answered Defendant's June 30, 2020 inquiry a month later, on July 30, 2020. First, Mrs. Meiman thanked Defendant for catching the error about the amount of the surgery expense. She submitted updated billing records for treatment provided through April 30, 2019, which increased the claimed cost of Dr. Benz' orthopedic services to $31,315.00. Mrs. Meiman described the ways in which medical impairments were affecting her life activities. Regarding lost wages, Mrs. Meiman denied income from formal employment, but she described her many responsibilities as a mother, homemaker, and help with the family businesses. Mrs. Meiman submitted a $66,600.00 wage loss claim for fulltime work at a minimum wage rate. The updated authorizations that Defendant had requested were not yet ready, however. *Id*. at 35.

32.    On August 18, 2020, Defendant asked Mrs. Meiman for clarification about the amount of Dr. Benz' bill. Mrs. Meiman had increased the amount of that part of her claim to $31,315.00, but the adjustor counted just $27,973.00 in bills. The adjustor submitted a spreadsheet of the dates and services provided to aid Mrs. Meiman's review. Defendant repeated its request for updated authorization forms. *Id*. at 37.

33.    Mrs. Meiman provided the authorization forms on October 19, 2020. *Id*. at 42.

34.    The adjustor used those authorizations on October 29, 2020 to request records from a wide range of medical care providers. The adjustor also informed Mrs. Meiman's counsel of taking that step. *Id*. at 44-45.

35.    In a letter to Plaintiffs' counsel dated January 14, 2021, Defendant announced completion of its "review of all documentation and information that has been received to date." *Id*. at 47. An explanation accompanied the letter. The injuries that Defendant attributed related to the car accident were identified as:

> neck strain (left sided C6-7 disc herniation with compression of C7 nerve root), left shoulder strain, left thumb sprain & left hand contusion, minor closed head injury (concussion—grade 2) with cognitive/memory/hearing issues.

*Id*. at 49. Mrs. Meiman's treatment history was summarized as consisting of: (1) chiropractic care for neck issues for two years without resolution, (2) overall sporadic treatment for four years, and (3) ultimately cervical disc surgery in February 2019. "All other injuries" were described as having been "resolved without complication or residual symptoms." *Id*.

36.    Although Defendant regarded the "treatment timeframe [as] extensive," it decided to "move forward for the purposes of this evaluation as accepting all medical bills incurred as arguably related to this loss." *Id*. Defendant calculated Mrs. Meiman's covered losses to consist of

$59,166.35 in economic damages, $3,000.00 for physical impairment, and $65,000.00 for non-economic damages (for a total of $127,166.35). *Id*. at 47.

37.     After accounting for the $100,000 Mrs. Meiman already had received, the resulting valuation of her UIM claim was $27,166.35. *Id*. at 47. Defendant's correspondence included a check for that amount. *Id*. at 48.

38.     On January 19, 2021, Mrs. Meiman denied that her acceptance of that payment fully resolved her claim. She stated that she would be sending additional information for "the ongoing evaluation of this UIM claim." *Id*. at 51.

39.     Three months later, on April 18, 2021, Mrs. Meiman demanded payment of the full $300,000 UIM policy benefit. Mrs. Meiman asserted that the car accident had "resulted in years of treatment" for which Defendant had received (or could have obtained) "her complete medical record, including care and treatment prior to the collision." ECF 30-7 at 1-2. Mrs. Meiman calculated her total damages to be $551,144.98 of which $51,564.98 were medical expenses, $231,980 were for future care expenses, $66,000 were for lost wages, $126,000 were for physical impairment, and $75,000 were for pain and suffering. *Id*. at 24.

40.     The demand letter contained impact statements from both Mrs. Meiman and her husband. *Id*. at 21-22. Defendant emphasizes that this was the first time they had reported such information. ECF 30 at ¶ 40. Mrs. Meiman denies improperly withholding the impact statements, noting that Defendant had not asked for them earlier. ECF 40 at 19.

41.     Four years after the car accident, on May 22, 2019, O.T. Resources, Inc. assessed Mrs. Meiman's condition. On July 18, 2019, it wrote a "Personal Injury Evaluation and Life Care Plan" report. ECF 30-7 at 26. Defendant notes that it received this report for the first time on April

18, 2021 as part of Mrs. Meiman's demand letter. ECF 30 at ¶ 41. Mrs. Meiman denies improperly withholding it, adding how Defendant had not asked for it earlier. ECF 40 at 19.

42.     The Life Care Plan calculated Mrs. Meiman's lost wages to be $625,000. The report's author based it on a kindergarten teacher's median wage of $56,290 less Mrs. Meiman's best-claimed post-injury wage of $25,000.00. That made Mrs. Meiman's lost wages $31,290 each year for the remaining twenty years of her working life. ECF 30-7 at 72.

43.     Mrs. Meiman had obtained a four-year college degree in physical education in 1996. However, she never worked as a public school teacher. ECF 30-1 at 4.

44.     Mrs. Meiman last worked for paid compensation in 2009 (about six and a half years before the car accident on May 4, 2015). She worked as a restaurant waitress. She quit that job upon the birth of her adopted daughter on January 18, 2010. ECF 30-1 at 6.

45.     Mrs. Meiman has not applied for new employment or sought other paid work since quitting the restaurant job in 2009. *Id*. However, as Defendant itself stresses at SUMF No. 60 below, Mrs. Meiman had several volunteer and irregular paid jobs after the injury event.

46.     Attached to Mrs. Meiman's April 18, 2021 demand letter was an Independent Medical Evaluation report written by Dr. Reinhard on May 2, 2019. At his deposition, the adjustor confirmed receiving it in June 2020 via a Dropbox link. ECF 40-2 at 18. (The Court notes that an email from Plaintiffs' counsel to the adjustor on May 17, 2021 references the Dropbox records' transmission on June 2, 2020. ECF 30-5.)

47.     Dr. Reinhard opined that Mrs. Meiman sustained a concussion; a cervical strain and sprain with left C6-7 herniation (requiring the February 2019 surgery); and vestibular and extraocular dysfunctions requiring ongoing vestibular rehabilitation. ECF 30-7 at 75-86.

48.     Mrs. Meiman's treating orthopedic surgeon, Dr. Benz, wrote a letter on June 26, 2019 after reviewing Dr. Reinhard's IME report. Mrs. Meiman discussed Dr. Benz' letter in her April 18, 2021 demand letter. ECF 40-15 at 18. Defendant submits Dr. Benz' letter into the record at ECF 30-7 at 73-74. Mrs. Meiman says she provided it to Defendant via a Dropbox link, before her demand letter. ECF 40 at 19.

49.     In his June 26, 2019 letter, Dr. Benz described Dr. Reinhard's IME as "very thorough." After conducting his own review of Mrs. Meiman's treatment history, Dr. Benz agreed with Dr. Reinhard that the February 2019 cervical surgery was causally related to the motor vehicle accident. ECF 30-7 at 73.

50.     Defendant advised Plaintiffs' counsel on May 17, 2021 that it was "in the process of seeking an independent peer records review as part of [its] ongoing UIM evaluation." ECF 30-5 at 52.

51.     In its May 17, 2021 email, Defendant also asked Plaintiffs' counsel to resend the Dropbox link (that had been sent earlier on June 2, 2020). *Id*.

52.     Plaintiffs' counsel resent the link on that same day. Counsel added that the Dropbox "includes all of Mrs. Meiman's collision-related medical treatment and billing records." *Id*.

53.     Defendant had asked RN Timothy Perdue to review the record and to draft questions for the peer review process. *Id*. at 54. RN Perdue's Medical Summary and Questions dated May 27, 2021 are found in the record at ECF 30-5 at 56-61. RN Perdue recommended that an orthopedist and a neuropsychologist conduct peer reviews. *Id*. at 54. Mrs. Meiman points out that RN Perdue's summary (which carries the heading, "Post Accident Treatment") omits Dr. Reinhard's IME, the Life Care Plan, and the supporting letters from Dr. Benz and Dr. Wicklund.

Mrs. Meiman furthers that those records also were not sent to Dr. Larson for his review. ECF 40 at 19-20.

54.     On June 7, 2021, Defendant informed Mrs. Meiman that it had requested two independent peer reviews of the record, one by a neuropsychologist and one by an orthopedist. ECF 30-5 at 62.

55.     Dr. Larson served as the reviewing orthopedist. In his report, which Defendant received on July 7, 2021, Dr. Larson reviewed treatment notes from a horse riding accident in February 2011 and physical therapy notes beginning May 2015. Dr. Larson also reviewed the treatment notes after the car accident beginning with chiropractic care through EMG testing in October 2020. This included Dr. Wicklund's letter of April 4, 2019 in which he opined that her treatment was related to the car accident and "was reasonable in amount." ECF 30-8. However, as Dr. Larson testified at his deposition, the records he had received for review apparently omitted Dr. Reinhard's IME report; "the CROM report" (which may be the Life Care Plan); and Dr. Benz' letter. ECF 40-20 at 6, 25, 27-28.

It was Dr. Larson's opinion that Mrs. Meiman had suffered a mild cervical strain without permanent injury. The symptoms Mrs. Meiman was reporting were far disproportionate to what reasonably could be anticipated. The cervical surgery in February 2019 corrected naturally progressive degenerative disc disease rather than an acute accident-related injury. Dr. Larson believed that Mrs. Meiman had reached maximum medical improvement within six to eight weeks of the car accident. ECF 30-8.

56.     Dr. Boyd conducted the independent neuropsychological review. In his report dated July 8, 2021, Dr. Boyd opined that Mrs. Meiman had sustained a concussion with no permanent cognitive or neuropsychological injuries. He saw no need for further cognitive or

neuropsychological diagnostic testing related to the accident. However, he believed that all of the medical care Mrs. Meiman had received during the three to four years after the injury event was reasonable and accident-related. ECF 30-8 at 11-22.

57.     On July 21, 2021, Defendant informed Mrs. Meiman that it had reviewed the two experts' reports and provided her counsel with copies. Defendant maintained its $27,166.35 valuation of Mrs. Meiman's UIM policy benefit. ECF 30-5 at 63.

58.     Mrs. Meiman agrees that Defendant's valuation includes her full $59,166.35 in past medical expenses, but she responds that it omits future anticipated medical expenses. ECF 40 at 20.

59.     Plaintiffs filed the instant civil action asserting breach of contract and bad faith claims in August 18, 2021.

60.     Since the car accident on May 4, 2015, Mrs. Meiman has worked as a volunteer on several occasions. In addition, she has earned money as a home party saleswoman; given children horseback riding lessons; and worked at a concession stand at the county fair. ECF 30-9.

61.     Mrs. Meiman describes herself as "a competitive barrel racer from the age of two until the time of the crash." ECF 40 at 20 (summarizing her deposition testimony).[1]

62.     Damian Arguello, Esq., is Plaintiffs' expert witness on the topic of insurance industry standards. Mr. Arguello opines that Defendant "acted contrary to applicable industry standards in investigating, evaluating, and responding to the Meimans' claims." ECF 30-10 at 1.

---

[1] The Court adds that Plaintiff continued to participate in competitive barrel racing *after* the accident. Indeed, she was the World Champion Barrel Racer of the National Senior Professional Rodeo Reserve in 2021. Plaintiff submits the expert witness report of Laura Lambert which is subject of this Court's Order at ECF 34. There, the Court permitted Ms. Lambert's opinion about how Plaintiff's barrel racing abilities changed after the car accident and the resulting injuries.

First, he says that it was not until receipt of Mrs. Meiman's demand letter in April 2021 when Defendant "performed any serious investigation into the cause of her injuries and treatment" or investigated properly and evaluated fairly her claim. This occurred two years after Mrs. Meiman had sought UIM policy benefits. Mr. Arguello says Defendant should have performed its investigation by late 2019. It should have started the adjustment process soon after the car accident, but in any event, Defendant should have completed its investigation within a few months of the underlying lawsuit's settlement. *Id*. at 44-46.

Second, while Mr. Arguello concedes that Defendant promptly requested Plaintiff to fill out medical and employment disclosure authorization forms, he believes it should have used those releases more proactively to obtain records directly (rather than rely on Plaintiffs' counsel to provide them). Mr. Arguello explains that an insurance company should not "delegate" information gathering to the insured's attorney. Moreover, the insurance company must verify all provided information. *Id*. at 45.

Third, Mr. Arguello faults Defendant for belatedly deciding to investigate the claim and challenge causation after Mrs. Meiman's April 2021 demand letter (for $550,000 in damages) when in January 2021 it had conceded causation (for UIM coverage of $27,166.35). *Id*. at 46. He believes that the correspondence going back to September 2019 had given Defendant "sufficient information to predict that Ms. Meiman would be seeking substantial damages under [its] policies, up to and including the $300,000 per person limit." *Id*. at 46. He adds that Defendant "did not properly review and consider information concerning non-economic damages Ms. Meiman suffered, as well as lost wages and lost earning capacity economic damages." *Id*.

Fourth, "[w]hen it finally got around to requesting records review," Mr. Arguello faults Defendant for not selecting a cervical specialist as its IME physician. *Id*. Rather, Dr. Larson was

an "[]arm injuries" specialist who had performed only one cervical surgery many years ago. Because Dr. Larson "appears to perform quite a bit of work for insurance companies doing medical records reviews and [IMEs]," Mr. Arguello suspects bias in Defendant's favor. *Id*. at 47.

Fifth, Mr. Arguello says the adjustor should have interviewed Plaintiffs as well as "anyone else who knew" Mrs. Meiman. The adjustor also failed to submit the opinion statements of Dr. Reinhard, Dr. Benz, and the Life Care Plan to its reviewers. *Id*.

Sixth, Mr. Arguello opines that Defendant's evaluation was unfair given its failure "to perform a prompt and thorough investigation." *Id*. He furthers that Defendant's records review was overly selective, "elevat[ing] the report of Dr. Larson above all other information" and taking the information that Plaintiffs' counsel had submitted out of context. The adjustor did not resolve the conflict in opinion statements and persisted in his low valuation despite receiving additional information in April 2021. *Id*. at 48.

Seventh, Defendant's failure to conduct a prompt and timely investigation and a fair evaluation in turn caused Defendant not to negotiate with Mrs. Meiman in a good faith manner. Defendant should have offered a compromise valuation "to bridge the gap between its $27,000 payment and the $300,000 demand [her counsel] made." *Id*.

Eighth, Mr. Arguello regards Defendant's correspondence with Plaintiffs' attorney as lacking substance—even if communications otherwise were regular and prompt. He says that Defendant did not explain why it was questioning causation after receipt of Plaintiff's April 2021 demand letter and left it to Plaintiffs' attorney to sort through its two peer review reports "to glean" that information. *Id*. at 49.

Ninth, Mr. Arguello infers from the absence of "any serious skepticism or questioning of [the adjustor's claim] handling" that the adjustor's superiors "merely accepted his

recommendations and failed to challenge his claims handling in any meaningful way." *Id*. The failure of the adjustor's superiors to direct him "to explore those issues until shortly before the statute of limitations ran . . . combined with [the adjustor's] deficient claims handling . . . compel[ed] Ms. Meiman to pursue the instant litigation." *Id*.

Tenth, Mr. Arguello believes that both Defendant and its adjustor knew of the governing standards for how to adjust a claim properly, but despite that knowledge, they acted in reckless disregard of Mrs. Meiman's interests. Mr. Arguello faults the adjustor for not "recogniz[ing] the various ways in which he actually failed to adhere to those standards." *Id*.

63.     The parties dispute whether Mr. Arguello concedes Defendant fairly evaluated Mrs. Meiman's claim after April 18, 2021. ECF 30 at ¶ 63; ECF 40 at 20-21.

## LEGAL STANDARD

### I.     Fed. R. Civ. P. 56(c)

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence

to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

The Court begins its discussion by noting how Colorado defines bad faith insurer conduct. Dispositive to this ruling is the question of whether a jury could find on this evidentiary record that Defendant had acted "unreasonably."

I.     **The Bad Faith Causes of Action**

A.     **Common Law Bad Faith**

Colorado law imputes on every insurance contract a covenant of good faith and fair dealing, the breach of which may constitute a tort. *Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010). By recognizing common law bad faith in the first-party context, Colorado law seeks to create "a reasonable balance between the right of an insurance carrier to reject a non-compensable claim submitted by its insured and the obligation of such carrier to investigate and ultimately approve a valid claim." *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 496 (Colo. App. 2011).

Two elements define the tort of bad faith in this context. To prevail, Plaintiffs first must prove that Defendant acted unreasonably under the circumstances. *Eppich v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-01697-PAB-MEH, 2009 WL 3162245, at *6 (D. Colo. Sept. 30, 2009). In other words, Defendant is liable if it unreasonably refused to pay or delayed payment of Mrs. Meiman's insurance claim and failed to act in good faith. *Sanderson*, 251 P.3d at 1217. The second element requires Plaintiffs to establish that Defendant either knowingly or recklessly disregarded the validity of her insurance claim. "[A]n insurance company recklessly disregards the unreasonableness of its coverage position when it acts with knowledge that its position lacks a reasonable basis or when it is deliberately indifferent to information concerning the claim." *Vansky v. State Farm Auto. Ins. Co.*, No. 20-cv-01062-PAB-NRN, 2022 WL 900160, at *9 (D. Colo. Mar. 28, 2022). It is the addition of this second element that differentiates the common law version of insurance bad faith from the statutory version. *Peden v. State Farm Mut. Auto. Ins. Co.*, 841 F.3d 887, n.3 (10th Cir. 2016).

The common law tort for the bad faith breach of an insurance contract may encompass the insurer's entire course of conduct cumulatively. *Haynes v. Allstate Fire & Cas. Ins.*, No. 19-cv-02397-STV, 2020 WL 816043, at *6 (D. Colo. Feb. 18, 2020). Moreover, an insurer can be held liable even if it eventually pays the insured's claim. *Sanderson*, 251 P.3d at 1217.

In sum, "an insurer will be found to have acted in bad faith *only* if it has *intentionally* denied, failed to process, or failed to pay a claim *without a reasonable basis*." *Zolman*, 261 P.3d at 497 (emphasis added).

### B.    Statutory Bad Faith

An insurer "shall not unreasonably delay or deny payment of a claim for benefits owed to . . . any first-party claimant." Colo. Rev. Stat. § 10-3-1115(1)(a). That statute explains that "an insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." Colo. Rev. Stat. § 10-3-1115(2). In the contrast to the common law version, "[t]he only element at issue in the statutory claim is whether an insurer denied benefits without a reasonable basis." *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 760 (Colo. App. 2012). As such, the civil cause of action of Colo. Rev. Stat. § 10-3-1116 imposes a less onerous standard on the insured. *Vaccaro*, 275 P.3d at 755. Because Colo. Rev. Stat. § 10-3-1116 permits the insured to recover attorney fees and costs and twice the amount of the covered benefit, that statutory version also imposes greater liability on the insurer. *Vaccaro*, 275 P.3d at 755.

### C.    Unreasonable Insurer Conduct

Common to both causes of action is the need to demonstrate unreasonable conduct by the insurance company in its denial of a policy claim or refusal to pay benefits. *Peden*, 841 F.3d at 891; *Green Earth Wellness Center, LLC v. Atain Specialty Ins. Co.*, 163 F. Supp. 3d 821, 836 (D.

18

Colo. 2016). Colorado law defines the general concept of "acting without a reasonable basis" to mean "pursuing a groundless position that is not supported by any credible evidence." *Anderson v. Am. Nat'l Prop. & Cas. Co.*, No. 17-cv-03016-KMT, 2020 WL 406077, at *12 (D. Colo. Jan. 23, 2020). By way of analogy, it is the same standard for determining whether to enter an attorney fee award against a public entity. *Vansky*, 2022 WL 900160 at *5. The burden of proof is on the insured to show how the insurance company's conduct was *un*reasonable; it is not the insurer's burden to establish the reasonableness of its conduct. *Green Earth*, 163 F. Supp. 3d at 836.

Moreover, the reasonableness of an insurer's conduct is gauged objectively. One aspect of the objective inquiry is compliance with industry standards or other statements of insurer obligations. *Peden*, 841 F.3d at 890-91. Some standards are expressly stated in statute. For example, Colo. Rev. Stat. § 10-3-1104(1)(h) requires an insurer to conduct a reasonable investigation based upon all available information before refusing a claim and to provide a prompt and reasonable explanation when denying a claim or settlement offer. Case law is another source of industry standards. "In conducting [an] investigation, the insurer must promptly and effectively communicate with anyone it was reasonably aware had . . . information pertaining to the handling of [a plaintiff's] claim." *Peden*, 841 F.3d at 891. The insurer must search for facts that both support and contradict the insured's claim with equal vigor, and it must discover all facts essential to understanding the insured's medical condition including the injury's effects on that person's employment and future earning capacity. *Id*. An insurer has a duty to pay covered benefits even if another component of the policy claim remains in reasonable dispute. *Haynes*, 2020 WL 816043 at *4.

The determination involves asking whether a reasonable insurer *under the circumstances* would have denied or delayed payment of the claim. *Vansky*, 2022 WL 900160 at *4.

Consequently, "[a]n insurer's decision to deny benefits to its insured must be evaluated based on the information before the insurer at the time of that decision." *Anderson*, 2020 WL 406077 at *6. Relevant forms of evidence could be an expert witness's opinion that no reasonable adjuster could believe the insurer's valuation or by identifying how an adjustor "conspicuously overlooked substantial components of the claim that would have been covered." *Green Earth*, 163 F. Supp. 3d at 836. The allegation that an insurer misused valuation software programs to artificially depress the value of an insured's claim is an example of a plausible bad faith theory. *Haynes*, 2020 WL 816043 at *5.

Relevant to the objective inquiry is whether the insurer's justification for denying policy benefits or delaying payment is "fairly debatable." *Sanderson*, 251 P.3d at 1217. This factor tests whether reasonable minds could disagree about whether a policy covers a claim. This is because Colorado law permits an insurer to challenge a claim that is fairly debatable. *Zolman*, 261 P.3d at 496; *Sanderson*, 251 P.3d at 1218. For example, "[a]n insurer is under no obligation to negotiate a settlement when there is a genuine disagreement as to the amount of compensable damages payable under the terms of an insurance policy." *Vaccaro*, 275 P.3d at 760. The insurer's mere mistaken belief that its insured's claim is not compensable does not indicate bad faith, *Zolman*, 261 P.3d at 497; nor does the mere fact that the insurer ultimately loses on the merits, *Sanderson*, 251 P.3d at 1217. The defense of fair debatability applies against both versions of the bad faith cause of action. *Vaccaro*, 275 P.3d at 755.

However, fair debatability is not an absolute defense. While fair debatability is relevant, it is not necessarily a determinative factor by itself. *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1260-62 (10th Cir. 2016); *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1226-27 (10th Cir. 2016). A "'fairly debatable' showing, standing alone, is insufficient to support

summary judgment for the insurer." *Glacier Const. Co. v. Travelers Prop. Cas. Co. of Am.*, 569 F. App'x 582, 590 (10th Cir. 2014); *see also Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1260–62 (10th Cir. 2016) (rejecting argument that, "under Colorado law, an insurer cannot act unreasonably in denying a fairly debatable claim"). If a plaintiff's claim were fairly debatable, summary judgment does not automatically follow unless there are no "genuine issues of material fact [and] reasonableness may be decided as a matter of law." *Glacier*, 569 F. App'x at 589–90 (quoting *Schuessler v. Wolter*, 310 P.3d 151, 162 (Colo. App. 2012)).

To meet the burden of proof, the insured may not rely on conclusory assertions. Rather, the insured must affirmatively show unreasonable conduct through evidence (in the form of objective industry standards, expert witness opinion, lay testimony, and documents). *Stamey v. Nat'l Gen. Ins. Co.*, No. 15-cv-00560-WJM-MJW, 2016 WL 8540310, at *4 (D. Colo. Sept. 22, 2016). *See also Goodson v. Am. Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 415 (Colo. 2004) (stating that "[t]he aid of expert witnesses is often required in order to establish objective evidence of industry standards" because "in most cases of professional negligence the applicable standard . . . is not within the common knowledge and experience of ordinary persons.") Likewise, the insured must explain how the specific evidence supports her position. *Anderson*, 2020 WL 406077 at *8. If the dispute concerns the amount of the policy benefit, then the insured must submit evidence to support her greater valuation. *Id* at *7; *Vansky*, 2022 WL 900160 at *6-9. If the dispute concerns the sufficiency of the insurer's investigation, then the insured must identify the information that if requested would have supported a different decision. *Vansky*, 2022 WL 900160 at *8.

Only "a genuine difference of opinion over the value of an insurance claim weighs against a finding of bad faith." *Vaccaro*, 275 P.3d at 755. As such, an insurer may not justify its benefits

denial simply by framing it as a valuation dispute, *id.*, or by "simply tender[ing] a different valuation of a claim," *Green Earth*, 163 F. Supp. 3d at 836.

The dispositive question is not whether an insured's claim *could* have been decided differently. That inquiry is more relevant to Plaintiffs' breach of contract claim which asks whether Defendant denied benefits actually owed under the insurance policy (regardless of good or bad faith conduct) and whether the amount of her covered damages actually exceeds Defendant's valuation. *Anderson*, 2020 WL 406077 at *12-14. The focus of a bad faith theory instead is on whether the circumstances reasonably permitted the insurer to make the decision that it did.

### D. Summary Judgment Review

"What constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury. However, in appropriate circumstances, as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law." *Zolman*, 261 P.3d at 497. *See also Eppich*, 2009 WL 3162245 at *6. For example, the above-cited *Anderson*, *Stamey*, *Vansky*, and *Zolman* cases were resolved on summary judgment in the insurers' favor.

## II. Whether Plaintiffs Show a Genuine Dispute of Material Fact over the Reasonableness of Defendant's Conduct.

It was nearly four years after the motor vehicle accident when Mrs. Meiman submitted to Defendant her First Notice of Loss, thereby formally making a request for UIM policy benefits. Of course, it was not until Mrs. Meiman fully resolved her claim against the tortfeasor's insurance policy that she knew how much of her damages remained uncompensated and thus covered by her own underinsured insurance policy benefit.

Mrs. Meiman submitted her First Notice of Loss to Defendant on April 15, 2019. On January 14, 2021, Defendant sent her a check for $27,166.35 representing the amount of damages that remained after the tortfeasor's $100,000 policy benefit. Defendant actively communicated

with Plaintiffs' counsel and investigated the claim during this period of time. Defendant's valuation was overall consistent with Mrs. Meiman's claim. Broadly speaking, Defendant did not dispute or contest Mrs. Meiman's reported damages.

Presumably, the record available to the adjustor in January 2021 included the IME report from Dr. Reinhard and a letter from Dr. Benz expressing agreement with Dr. Reinhard's causation opinion. However, it is unclear how those two reports would have changed Defendant's valuation. Defendant already had included compensation for the February 2019 neck surgery in its offer. It is undisputed that Defendant did not know of the Life Care Plan when it sent Mrs. Meiman the check. It is the Life Care Plan that provides the basis for Mrs. Meiman's substantially increased damages.

The demand letter that Mrs. Meiman submitted three months later, on April 18, 2021, fundamentally changed the nature of her claim. She now was claiming over half a million dollars in total damages. Mrs. Meiman does not explain why she substantially increased her claim (to an amount that would require the full policy limit to cover) at that later time. Defendant reacted by pursuing a more thorough investigation. It asked for updated authorization forms and the link to the Dropbox records database again. It also solicited reviews by two physicians. Just three months later, on July 21, 2021, Defendant announced its decision. It did not change its valuation.

The parties dispute whether the damages Mrs. Meiman incurred as a result of the car accident are $127,166.35 (as Defendant conceded, of which the UIM policies would pay $27,166.35) or $551,144.98 (which Mrs. Meiman claimed on April 18, 2021, which would require the full UIM benefit to cover). However, that dispute concerns Plaintiffs' breach of contract cause of action. At issue here are Plaintiffs' bad faith causes of action and the way in which Defendant handled Mrs. Meiman's policy claim.

23

In arguing that a jury could find Defendant acted unreasonably in the way needed to show bad faith, Plaintiffs rely heavily on the opinion of their expert witness. However, the bulk of Mr. Arguello's opinion is insufficient to create the dispute of fact that Plaintiffs needs to survive summary judgment. Mr. Arguello does provide a lengthy and detailed discussion of insurance standards generally and has personal professional experience with insurance claim adjusting. He also undertakes an extended criticism of all the ways Defendant could have processed the claim better (and more favorably to Mrs. Meiman). However, in the main he does not create a sufficient link between the two. The Court will address Mr. Arguello's opinions and analyze whether they establish a basis for a triable issue of bad faith.

First, he states that Defendant should have engaged in a serious investigation before April 2021, when Plaintiffs' demand of over one-half million dollars was first submitted. He also states that before Plaintiffs' counsel provided a detailed itemization of this amount, Defendant should have predicted Plaintiffs' demand would exceed the $300,000.00 UIM limit. However, even Plaintiffs' statement of undisputed facts shows that during the April 2019-April 2021 period, Defendant had a continuous dialogue with Plaintiffs' counsel requesting and receiving additional information. Moreover, this Court will not put a burden of clairvoyance on the Defendant. These opinions do not provide a basis for extra-contractual damages.

Next, Mr. Arguello's opinion concerning Defendant's obligation to more proactively obtain medical records directly rather than through Plaintiffs' counsel is ineffective. Proceeding cautiously by ensuring that, once counsel is involved, the insured's attorney is treated as a conduit in communicating all stages of the investigation can hardly be a basis for a finding of bad faith or unreasonable conduct.

Mr. Arguello further criticizes Defendant for using a "hand specialist" to conduct an IME on Mrs. Meiman when her injuries involved primarily her cervical spine. However, Plaintiffs' Response to the Motion admits that Dr. Larson is an orthopedist, and Dr. Larson's report notes that he is a Fellow of the American Academy of Orthopaedic Surgeons (FAAOS). There is no basis for a bad faith claim here.

Furthermore, Mr. Arguello's position that Defendant should have interviewed Mrs. Meiman and anyone else who knew her is not argued whatsoever in Plaintiffs' Response. Here, both parties recognize the volume of records that were available and were reviewed concerning Mrs. Meiman's injuries. The Court cannot find the absence of an interview to support bad faith.

In addition, Mr. Arguello's argument that Defendant's evaluation was unfair and overly selective lacks sufficient specificity for this Court to use it as a basis for finding bad faith. It is also conclusory, as is his statement that Defendant should have offered a compromise valuation between the $27,166.35 it did offer, and the $300,000.00 policy limit.

Mr. Arguello's next two criticisms concern the depth of Defendant's correspondence to Plaintiffs' counsel and the allegation that Defendant's adjustor's supervisors did not materially scrutinize his claims handling. Again, these are conclusory and do not provide specific information from the record to support a jury verdict on bad faith.

Finally, Mr. Arguello simply states that Defendant should have known they were acting in reckless disregard of Mrs. Meiman's interests. The Court can hardly find this as a factual basis for allowing a jury to deliberate on the bad faith claims in this case.

Considering each of these in isolation or as a whole, the record fails to establish a genuine dispute of material fact concerning any manner in which Defendant acted unreasonably. However, Plaintiffs do forward one opinion of Mr. Arguello that creates a material issue of fact. Defendant's

representative, Mr. Feliciano, testified that Defendant's policy is to provide to any record reviewer all information that had been received from the insured, including, as relevant here, the Life Care Plan and Drs. Reinhard's and Benz' evaluations. Mr. Feliciano explained that it is Defendant's practice to forward all collected information to the record reviewer. In its Response in opposition to Plaintiffs' Cross-Motion for Summary Judgment (which concerns the unrelated issue of Defendant's affirmative defenses), Defendant does not dispute Plaintiffs' Statement of Undisputed Statements of Facts Nos. 65 and 66 which concerns deposition testimony by the insurance adjuster about what records Defendant should have sent to the record reviewers. ECF 49 at 2. Plaintiffs' expert witness flags this omission as an instance of unreasonable conduct. Defendant concedes that its two record reviewers did not actually receive these documents (although it emphasizes how they later affirmed their respective opinions after the opportunity to take these additional documents into consideration). ECF 45 at 53. That is not the end of the matter. The adjuster's testimony could be read to indicate his (mistaken) belief that Defendant's vendor actually had done so. ECF 40-2 at 23-24. That is the explanation Defendant provides in its Response to Plaintiffs' Cross-Motion for Summary Judgment. There, Defendant explains that it was during the course of litigation when it discovered the oversight. ECF 49 at 5.

Construing the matter broadly in Plaintiffs' favor, as the Court must, that omission, even if mistakenly done, potentially supports Plaintiffs' allegation of unreasonable conduct or reckless disregard. *See, e.g., Montmeny v. State Farm Mut. Auto. Ins. Co*., No. 20-CV-3378-WJM-SKC, 2022 WL 1746901, at *5 (D. Colo. May 31, 2022) ([T]here is also a genuine issue of fact regarding State Farm's violation of its own policies[, which] prevent[s] judgment from being entered as a matter of law on Montmeny's bad faith claims."). This is especially true because the omitted documentation constitutes the heart of Plaintiffs' case—that Mrs. Meiman's primary care doctor

and her reviewing orthopedist opine that the 2019 issues were caused by the 2015 accident, and that Mrs. Meiman's damages, as noted in the Life Care Plan, are materially higher than prior evidence of damages. Moreover, a jury may well find that Defendant cannot simply rely on a vendor to do the necessary tasks that Defendant itself must perform, and when that vendor fails in a material way, to place the blame there.

For these reasons, the Court does not grant summary judgment in Defendant's favor. However, in Colorado, "the tort of bad faith breach of an insurance contract encompasses an entire course of conduct and is cumulative." *Dale v. Guar. Nat. Ins. Co.*, 948 P.2d 545, 551 (Colo. 1997). The Court foresees an issue at trial concerning Mr. Arguello's opinions, what Plaintiffs will be permitted to argue concerning support for their two extra-contractual claims, and how the jury will be instructed on this question. Therefore, the Court will entertain appropriate pretrial motions to address this. Moreover, this ruling will not preclude a Rule 50 motion in the event Defendant's conduct as established through testimony at trial, particularly the failure to provide relevant documents to the reviewer, does not rise to the level of bad faith.

## III.   Cross Motion for Partial Summary Judgment

Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF 40) is denied as untimely. The deadline for filing dispositive motions was August 1, 2022. Plaintiffs did not file it until September 12, 2022, incorporating it into her Response in opposition to Defendant's (timely) Motion for Partial Summary Judgment. Plaintiffs did not ask the Court for leave to file it late. Nor is the Motion a true "cross-motion." It concerns Defendant's affirmative defenses, which is a matter wholly distinct from the subject of Defendant's Motion. Finally, the purported cross motion violates D.C.COLO.LCivR 7.1(d), which states: "A motion shall not be included in a response or

reply to the original motion. A motion shall be filed as a separate document." Indeed, the Clerk of the Court did not even designate the filing as a cross motion.

## **CONCLUSION**

Whether Defendant's valuation is the correct one is beyond the scope of this ruling. This Court limits its ruling to the question of whether Defendant's claim investigation and offered resolution fell short of industry standards and was otherwise deficient to the degree needed to demonstrate bad faith conduct. Even after taking Plaintiffs' expert witness opinion into consideration, the Court sees no genuine dispute of fact over the reasonableness of Defendant's conduct except for the one particular omission identified above.

Accordingly, Defendant's Motion for Summary Judgment [filed August 1, 2022; ECF 30] is **denied consistent with this opinion.**  Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF 40) is **denied**.

Entered this 13th day of October, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge